**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE AMERICAN CIVIL LIBERTIES
UNION OF NEVADA; DOES 1-8, and
DOES A-S,

*Plaintiffs-Appellees,*

v.

CATHERINE CORTEZ MASTO,
Esquire, Attorney General of the
State of Nevada; GERALD HAFEN,
Director of the Nevada
Department of Public Safety;
BERNARD W. CURTIS, Chief, Parole
and Probation Division of the
Nevada Department of Public
Safety; CAPTAIN P.K. O'NEILL,
Chief, Records and Technology
Division of the Nevada
Department of Public Safety,

*Defendants-Appellants,*

and

MICHAEL HALEY, Sheriff of the
Washoe County Sheriff's Office;
MICHAEL POEHLMAN, Chief of the
Reno Police Department; RICHARD
GAMMICK, District Attorney of
Washoe County;

Douglas Gillespie, Sheriff of the Las Vegas Metropolitan Police Department; Joseph Forti, Chief of the North Las Vegas Police Department; David Roger, District Attorney of Clark County; Richard Perkins, Chief, Henderson Police Department,
*Defendants.*

No. 08-17471

D.C. No.
2:08-cv-00822-JCM-PAL

The American Civil Liberties Union of Nevada; Does 1-8, and Does A-S,
*Plaintiffs-Appellees,*

v.

Catherine Cortez Masto, Esquire, Attorney General of the State of Nevada; Gerald Hafen, Director of the Nevada Department of Public Safety; Bernard W. Curtis, Chief, Parole and Probation Division of the Nevada Department of Public Safety; Captain P.K. O'Neill, Chief, Records and Technology Division of the Nevada Department of Public Safety,
*Defendants-Appellants,*

and

MICHAEL HALEY, Sheriff of the
Washoe County Sheriff's Office;
MICHAEL POEHLMAN, Chief of the
Reno Police Department; RICHARD
GAMMICK, District Attorney of
Washoe County; DOUGLAS
GILLESPIE, Sheriff of the Las Vegas
Metropolitan Police Department;
JOSEPH FORTI, Chief of the North
Las Vegas Police Department;
DAVID ROGER, District Attorney of
Clark County; RICHARD PERKINS,
Chief, Henderson Police
Department,
                    *Defendants.*

No. 09-16008
D.C. No.
2:08-cv-00822-
JCM-PAL
OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
December 7, 2011—San Francisco, California

Filed February 10, 2012

Before: Stephen S. Trott and Carlos T. Bea, Circuit Judges,
and William H. Stafford, Senior District Judge.*

Opinion by Judge Trott

---

*The Honorable William H. Stafford, Jr., Senior District Judge for the
U.S. District Court for Northern Florida, sitting by designation.

**COUNSEL**

Margaret A. McLetchie, ACLU of Nevada, Las Vegas, Nevada; and Robert Langford, Langford & Associates, Las Vegas, Nevada, for the plaintiffs-appellees.

Binu G. Palal, Nevada Attorney General's Office, Las Vegas, Nevada, for the defendants-appellants.

**OPINION**

TROTT, Circuit Judge:

The State of Nevada appeals the district court's permanent injunction prohibiting the retroactive application of two Nevada laws: Assembly Bill 579, expanding the scope of sex offender registration and notification requirements, and Senate Bill 471, imposing, inter alia, residency and movement restrictions on certain sex offenders. The district court permanently enjoined retroactive application of both bills on the grounds that they violated the Ex Post Facto Clause of the United States Constitution, the Contract Clause of the United States Constitution, the Double Jeopardy Clause of the Fifth Amendment, and the Due Process Clause of the Fourteenth Amendment. With respect to Assembly Bill 579, we hold that its retroactive application is constitutionally sound, and we reverse. With respect to Senate Bill 471, we conclude that our consideration of its disputed provisions was mooted by the State of Nevada's authoritative judicial admission that — regardless of the existence of the injunction — the State will not retroactively impose residency and movement restrictions. Because the State's concession moots its own appeal, we remand to the district court to consider vacating its Order as to Senate Bill 471 in favor of a binding consent decree. But if no consent decree can be negotiated, our dismissal of the State's appeal will leave the district court's injunction in vigor.

**I**

**BACKGROUND**

In July 2007, the State of Nevada passed into law two statutes ("Revised Laws") imposing various requirements on individuals convicted of sexual offenses, Assembly Bill 579 ("AB 579") and Senate Bill 471 ("SB 471").

Nevada's AB 579 is best understood against the backdrop of the federal Sex Offender Registration and Notification Act ("SORNA"), enacted as a section of the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"). Pub. L. No. 109-248 (2006). SORNA encourages state governments, U.S. territories, and federally recognized Indian tribes to adopt a standardized sex offender registration and notification regime. 42 U.S.C. § 16912. It prescribes detailed registration and notification requirements to be adopted by each jurisdiction. To encourage implementation of the scheme, SORNA reduces federal law enforcement funds to jurisdictions that fail to adopt it, *id.* § 16925, and authorizes dispensation of grants to offset the cost of implementation, *id.* § 16926. SORNA also created the "Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking ("SMART Office") within the Department of Justice. *Id.* § 16945. The SMART Office assists jurisdictions with implementation of SORNA's registration and notification program and monitors compliance.

The State of Nevada passed AB 579 into law on June 13, 2007 to bring Nevada into compliance with SORNA. The law replaced Nevada's existing registration requirements with the scheme laid out in SORNA. The central innovation of SORNA and AB 579 is a classification system for sex offenders that places them into one of three risk tiers based solely on their crime of conviction. Registration and notification requirements are then keyed to an offender's tier classification. Largely using the language of SORNA, AB 579 also (1) expands the category of individuals required to register, (2) expands the time period during which sex offenders are subject to registration requirements, (3) requires sex offenders to register in person, and (4) obliges law enforcement actively to provide notice of the status of certain registrants. The SMART Office determined that after passage of AB 579

Nevada had "substantially implemented" SORNA requirements.[1]

AB 579 goes beyond SORNA in its requirement that law enforcement provide public notice of the status of certain sex offenders. For example, SORNA requires that an appropriate official provide notice of an individual's sex offender status to "each school and public housing agency" in the area where a sex offender resides. *Id.* § 16921(b)(2). Adding to this mandate, AB 579 requires law enforcement also to provide notification to youth organizations and religious organizations. AB 579 § 29(2). Additionally, for Tier III offenders (the most serious offenders), AB 579 obligates law enforcement to provide updated status information to "members of the public who are likely to encounter the offender." *Id.* § 29(2)(a)(4).

Nevada's governor signed SB 471 into law the day after he signed AB 579, and the relevant provisions went into effect on October 1, 2007. In the provisions at issue in this action, SB 471 requires Nevada courts to include movement and residency restrictions in the term of probation, parole, or lifetime supervision imposed by a court upon individuals convicted of a sexual offense.[2] The law commands that sex offenders placed on lifetime supervision may not "knowingly be within 500 feet of any place" or reside anywhere "located within 1,000 feet of any place" that is "designed primarily for use by or for children." SB 471 §§ 8(3), (4). Depending on their crime of conviction, parolees and probationers who are Tier III offenders are subject also to the movement restriction and/or the residency restriction. *See id.* §§ 2(1)(m), (2)(a)

---

[1]*See* Press Release, Department of Justice, Justice Department Announces Four More Jurisdictions Implement Sex Offender Registration and Notification Act (May 12, 2011), *available at* http://www.ojp. usdoj.gov/newsroom/pressreleases/2011/SMART11102.htm.

[2]Lifetime supervision is a special sentence imposed by a court on every defendant "convicted of a sexual offense." Nev. Rev. Stat. § 176.0931(1). Lifetime supervision commences after any period of probation or parole. *Id.* § 176.0931(2).

(pertaining to probation and suspended sentences); *id.* §§ 9(1)(k)(1), 10(1)(a) (pertaining to parole). Although SB 471 contains several other provisions, Plaintiffs' Amended Complaint challenged only the provisions of SB 471 imposing movement and residency restrictions and our decision is limited to those requirements.[3]

The American Civil Liberties Union of Nevada ("ACLU"), together with several unnamed Does, all individuals convicted of sexual offenses (together, "Plaintiffs"), brought a civil action challenging both facially and as applied the retroactive application of AB 579 and SB 471. They alleged that retroactive application of the new laws would violate a litany of state and federal constitutional provisions, and they requested declarative and injunctive relief. The complaint named as defendants Nevada's Attorney General, several officials in Nevada's Department of Public Safety (responsible for Nevada's parole and probation services), and various local law enforcement officials, all in their official capacity.

On June 30, 2008, United States District Court Judge James C. Mahan, ruling from the bench, granted a preliminary injunction against retroactive application of both laws. After the court issued the preliminary injunction, Plaintiffs agreed to a stipulation with the local law enforcement defendants that dismissed them from the case. The stipulation specified that the dismissal was premised on the condition that the dismissed defendants would abide by the preliminary injunction and "any other injunction or declarative relief granted" by the court.

---

[3]In their reply brief to the district court, Plaintiffs did request relief from retroactive application of the provisions of SB 471 authorizing collection of biological samples and electronic monitoring of sex offenders. *See* SB 471 §§ 2, 8, 10. Plaintiffs never amended their complaint to include this cause of action, and the district court was explicit that the injunction did not extend to electronic monitoring. A challenge to those provisions— or any of the provisions of SB 471 other than its residency and movement restrictions — is not before us.

On September 10, 2008, Judge Mahan issued a permanent injunction and ordered the Plaintiffs to draft an order granting the injunction. On October 7th, Judge Mahan signed the Plaintiffs' order, which enjoined retroactive application of both laws on the federal constitutional grounds that their application to offenders convicted before the dates the two laws became effective was a violation of procedural due process, the Ex Post Facto Clause and the Double Jeopardy Clause. The only discernable reasoning articulated by the court for its decision, under the pressure of an expedited schedule, was that

> It is as though the legislature passes a law that says anyone who is ever convicted of burglary must now serve an additional five years in prison no matter when he or she was convicted regardless of the fact that they've been law-abiding citizens since their release from prison. That's not fair.

The court also relied on "the Contracts clauses of the U.S. and Nevada Constitutions," but it did so without analysis or explanation. The remaining defendants (together "the State" or "Nevada") now appeal that decision (Appeal No. 08-17471).

After issuing the permanent injunction, the district court awarded Plaintiffs $145,823.50 in attorneys' fees as the prevailing party under 42 U.S.C. § 1988(b). The State did not appeal the award of attorneys' fees, but instead it moved the court to stay the payment pending their appeal on the merits pursuant to Federal Rule of Civil Procedure 62(d). The court denied the State's request for a stay, prompting the State to file an appeal of that order (Appeal No. 09-16008), which was consolidated with the State's appeal of the permanent injunction.

## II    JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. The district court's grant of injunctive relief "involves factual, legal, and

discretionary components." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). We review the district court's legal conclusions de novo, its factual findings for clear error, and the scope of relief for abuse of discretion. *Id.* The district court's decision to grant or deny a stay is reviewed for abuse of discretion. *In re Combined Metals Reduction Co.*, 557 F.2d 179, 193 (9th Cir. 1977).

## III

## ANALYSIS

### A.   Assembly Bill 579

#### 1.   Ex Post Facto and Double Jeopardy Clause

**[1]** The Ex Post Facto Clause of the Constitution prohibits our state and federal governments from retroactively imposing additional punishment for commission of a criminal offense. U.S. Const. art. I, §§ 9, cl. 3. The Double Jeopardy Clause similarly prohibits subjecting a person to jeopardy of multiple punishments for the same criminal act. U.S. Const. amend. V. Under both constitutional clauses, courts apply the identical two-step test to determine whether a newly enacted legislative scheme constitutes an additional form of punishment. *Russell v. Gregoire*, 124 F.3d 1079, 1086 n.6 (9th Cir. 1997) (holding that Double Jeopardy Clause determination is analogous to Ex Post Facto Clause determination); *see Hatton v. Bonner*, 356 F.3d 955, 961 (9th Cir. 2004).

**[2]** The first step of the inquiry requires courts to determine whether the legislature intended to impose a criminal punishment or whether its intent was to enact a nonpunitive regulatory scheme. *Smith v. Doe*, 538 U.S. 84, 92 (2003). If the legislature did intend to impose a criminal punishment, that is the end of the inquiry — the law may not be applied retroactively. *Id.* However, if the legislature's intent was to create a civil regulatory regime, we must move to the second

step of the inquiry. There, the issue is whether the law is "so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* (internal quotation marks and alteration omitted).

The Supreme Court held in *Smith v. Doe* that Alaska's sex offender registration and notification scheme did not constitute unconstitutional retroactive punishment. *Id.* at 105-06. Following the Court's guidance in *Smith*, we upheld the retroactive application of a California sex offender registration statute, which contained several provisions that differ from the Alaska statute, *Hatton*, 356 F.3d at 967, and we follow that guidance here.

In *Hatton*, the state law we upheld was not enacted pursuant to SORNA and we have not explicitly ruled on the constitutionality of retroactive application of SORNA-inspired requirements. Many of our sister circuits, however, have considered this issue. Unanimously they have concluded that retroactive imposition of SORNA requirements is constitutional.[4] Because Nevada's version of SORNA does not contain any registration provision that materially distinguishes it from *Smith*, we join them in concluding that the requirements of AB 579 do not constitute retroactive punishment in violation of the Ex Post Facto Clause or Double Jeopardy Clause.

### a.   Legislative Intent

The first inquiry is whether the legislature " 'indicated either expressly or impliedly a preference for one label or another' " — that is, civil or criminal. *Smith*, 538 U.S. at 93 (quoting *Hudson v. United States*, 522 U.S. 93, 99 (1997)).

---

[4]*United States v. W.B.H*, ___ F.3d ___, 2011 WL 6156956, at *11 (11th Cir. Dec. 13, 2011); *United States v. Leach*, 639 F.3d 769, 773 (7th Cir. 2011); *United States v. Young*, 585 F.3d 199, 206 (5th Cir. 2009) (per curiam); *United States v. May*, 535 F.3d 912, 919 (8th Cir. 2008); *United States v. Hinckley*, 550 F.3d 926, 939 (10th Cir. 2008).

This issue is "one of statutory construction," *Seling v. Young*, 531 U.S. 250, 261 (2001), that looks to the "statute's text and its structure to determine the legislative objective," *Smith*, 538 U.S. at 92. We review this question of statutory interpretation de novo. *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1131 (9th Cir. 2009).

**[3]** The Legislative Counsel's Digest prefacing AB 579 states that its purpose is to further the public safety goals of the federal Adam Walsh Act. AB 579, 1; *see also Nevadans for Prot. Prop. Rights, Inc. v. Heller*, 141 P.3d 1235, 1246 (Nev. 2006) (relying upon the Legislative Counsel's Digest to determine legislative intent). The preface explains that AB 579 was enacted "[i]n furtherance of [the] purpose" of the Adam Walsh Act, which it recognizes was to "protect the public by establishing a comprehensive national system for the registration of sex offenders . . . ." AB 579, 1. The preface's characterization of the United States Congress's intent in passing SORNA is apt. SORNA states on its face that its purpose is to "protect the public from sex offenders and offenders against children." 42 U.S.C. § 16901. Congress was motivated by the desire to close gaps in jurisdictions' sex offender registries left open after earlier federal efforts to encourage uniform national registration requirements. *See United States v. Begay*, 622 F.3d 1187, 1190 (9th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S. Ct. 3026 (2011).

The regulatory explanation of purpose on the face of AB 579 is substantiated by its legislative history and the structure of the bill. The bill was drafted by the Office of the Attorney General with the express objective of bringing Nevada into compliance with SORNA. The bill adopts the registration and notification program detailed in SORNA, and each of the provisions challenged by Plaintiffs closely tracks the provisions of SORNA. In sum, the text and structure of AB 579 evinces the Nevada legislature's intent to adopt a civil regulatory regime in alignment with the public safety rationale that moti-

vated the United States Congress to pass the federal Adam Walsh Act.

Plaintiffs' arguments do not undermine this clear evidence of legislative intent. It is true that AB 579's statutory changes are codified under the section of Nevada state code titled "Procedure in Criminal Cases." The manner of codification can be indicative of the legislature's intent to deem a law civil or criminal. *See Hatton*, 356 F.3d at 962. The Supreme Court has made clear, however, that the "location and labels of a statutory provision" are not dispositive indicia of legislative intent and must be considered in context. *Smith*, 538 U.S. at 94.

In this case, the placement of the codification of AB 579 is not illuminating evidence of legislative intent because it amends the sex offender registration scheme previously codified under Nevada's criminal code. The Nevada Supreme Court had previously held that those antecedent registration and notification requirements "were not intended to impose a penal consequence but were instead implemented to protect the community and assist law enforcement in solving crimes." *Nollette v. State*, 46 P.3d 87, 91-92 (Nev. 2002). Thus, AB 579 amounts to an expansion of a registration and notification regime that the Nevada Supreme Court has already determined is civil in intent, despite its site of codification. *See Hatton*, 356 F.3d at 962 (relying on state court interpretation of legislative intent). There is no indication that the intent of the Nevada legislature was to transform the antecedent public safety oriented system into a form of punishment simply through expanding the scope of its requirements. Though many of the AB 579 requirements "relate to criminal administration" because they are administered as conditions imposed upon an offender's release from prison, "they are not in themselves punitive." *Smith* 538 U.S. at 95.

Plaintiffs also point to the fact that AB 579 mandates registration procedures rather than delegating responsibility for

their creation to an administrative agency, as did the Alaska law at issue in *Smith*. *See id*. at 96. AB 579's detailed requirements for categorizing sex offender status and maintaining a registry, however, remain wholly unlike the procedural "safeguards associated with the criminal process." *Id.* Nevada adopted nearly wholesale a regulatory scheme drafted by Congress — there was little left to delegate. The inclusion in AB 579 of a criminal penalty for failure to comply with registration requirements does not distinguish it from the law at issue in *Smith*, which also criminalized non-compliance. *Id.*

**[4]** We conclude that the intent of the Nevada legislature in passing AB 579 was to create a civil regulatory regime with the purpose of enhancing public safety.

### b. Punitive Effect

We turn to the second inquiry: "[W]hether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* at 92 (internal quotation marks and alteration omitted). In conducting this inquiry, "only the clearest proof" of punitive effect is sufficient to override the Nevada legislature's intent to create a civil regulation. *Id.* (internal quotation marks omitted). Given this high burden, "even a showing that most of the relevant factors weigh in favor of considering a punishment criminal in nature may be insufficient to transform it into a criminal punishment." *United States v. Reveles*, 660 F.3d 1138, 1143 (9th Cir. 2011). With all respect to the district court, we reject its analogy of these statutes to returning a burglar to prison for five years after the service of his sentence.

The *Smith* Court turned to the factors laid out in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), as a "useful framework" for evaluating punitive effect. *Smith*, 538 U.S. at 97. The Court focused on five of the *Mendoza-Martinez* factors as most relevant in evaluating the registration and notification law at issue. Those five factors are the degree to

which the regulatory scheme imposes a sanction that (1) has historically been regarded as punishment; (2) constitutes an affirmative disability or restraint; (3) promotes the traditional aims of punishment; (4) is rationally connected to a nonpunitive purpose; and (5) is excessive in relation to the identified nonpunitive purpose. *Id.* The Court also addressed the two remaining *Mendoza-Martinez* factors, but concluded that they were of "little weight" in the context of sex offender registration legislation. *Id.* at 105. Those factors are (6) whether the sanction requires a finding of scienter and (7) whether the sanction applies to behavior that is already a crime. *Id.* We evaluate each of these factors in turn.

### i  Historical Form of Punishment

*Smith* rejected analogies between sex offender registration requirements and "shaming punishments of the colonial period." *Id.* at 97. Historical shaming punishments were intended to expose and publicly disgrace individuals, while sex offender registration laws disseminate accurate information about offenders for public safety purposes. *Id.* at 97-99. While modern notification provisions may humiliate offenders, that shame is "but a collateral consequence of a valid regulation." *Id.* at 99.

Plaintiffs attempt to distinguish *Smith* on the grounds that, unlike the Alaska law at issue there, AB 579 requires law enforcement agencies *actively* to provide notice of an individual's sex-offender status in many instances. *See* AB 579 § 29(2). We have previously held that a state law which included a provision requiring government agencies actively to notify the public of certain individuals' sex-offender status was not so punitive in effect that it violated the Ex Post Facto Clause. *Russell*, 124 F.3d at 1082, 1091-92. That logic remains sound in the wake of *Smith*. Active dissemination of an individual's sex offender status does not alter the Court's core reasoning that "stigma . . . results not from public display for ridicule and shaming but from the dissemination of accu-

rate information about a criminal record, most of which is already public." *Smith*, 538 U.S. at 98. Though "humiliation increas[es] in proportion to the extent of the publicity," the "purpose and the principal effect of notification are to inform the public for its own safety." *Id.* at 99.

AB 579 also vests responsibility for disseminating information to local law enforcement agencies, § 29(2), and strengthens penalties for use of information from the community notification website to commit a crime, § 10.5. Both of these provisions further indicate the law is intended to disseminate information for public safety purposes and not to punish registrants. On the whole, the requirements of AB 579 are not akin to historical forms of punishment.

### ii  Affirmative Disability or Restraint

Under this factor, "we inquire how the effects of [AB 579] are felt by those subject to it." *Smith*, 538 U.S. at 99-100. The "paradigmatic affirmative disability" is the "punishment of imprisonment." *Id.* at 100. The *Smith* Court found that Alaska's law imposed no physical restraint and therefore constituted a negligible affirmative disability. The Court reasoned that any negative consequences to registrants' employment or housing prospects stemmed from the fact of conviction, rather than the existence of the registry. *Id.* at 101.

The registration and notification requirements of AB 579 are indistinguishable from those at issue in *Smith*. AB 579 imposes no physical restraint. *See id.* at 100. It does not limit the activities that registrants may pursue or limit registrants' ability to change jobs or residences. *See id.* It is less onerous than occupational debarment, which the Court has held is not an affirmative disability. *See id.*

Plaintiffs focus on the fact that AB 579 requires registrants to appear in person to update their registration information. *See* AB 579 § 40. For the highest level offenders, this duty to

appear is imposed "[n]ot less frequently than every 90 days." *Id.* § 40(c). Plaintiffs point out that in *Smith*, the Supreme Court reversed our holding that Alaska's law imposed an affirmative disability, in part because we had mistakenly concluded that it required in-person registration. *See Smith*, 538 U.S. at 101. However, the Court's resolution of our factual error did not amount to a holding that in person registration necessarily constitutes an affirmative disability. We recognized as much in *Hatton*, 356 F.3d at 964, where we held that the in-person registration requirement in a California law, when "balanced against the other facts . . . [was] simply not enough to turn [the law at issue] into an affirmative disability or restraint."

We reach the same conclusion with respect to AB 579. While recognizing the burden that the registration requirement places on many registrants, on balance the law does not constitute an affirmative disability. "Appearing in person may be more inconvenient, but requiring it is not punitive." *W.B.H.*, 2011 WL 6156956, at *8. The requirement that sex offenders present themselves for fingerprinting is not akin to imprisonment, and the burden remains less onerous than occupational debarment. *See Smith*, 538 U.S. at 100.

### iii   Traditional Aims of Punishment

This factor requires evaluating whether the law promotes traditional aims of punishment — i.e., deterrence and retribution. *Hatton*, 356 F.3d at 965. The *Smith* Court acknowledged that registration laws might have a deterrent effect, but held that preventing recidivism is also a legitimate objective of civil regulation. *Smith*, 538 U.S. at 102. The Court rejected the argument that reporting requirements "measured by the extent of the wrongdoing, not by the extent of the risk posed," demonstrated retributive intent. *Id.* (internal quotation marks omitted). AB 579 is indistinguishable on this basis, and this factor does not tilt toward a finding of punitive effect.

### iv   Rational Connection to a Nonpunitive Purpose

The *Smith* Court held that whether the challenged regulation is rationally connected to a nonpunitive purpose is "a most significant factor" in the effects analysis. *Id.* at 102 (internal quotation marks and alteration omitted). The Court held that the interest in "alerting the public to the risk of sex offenders in their community" constitutes a "legitimate nonpunitive purpose." *Id.* at 102-103 (internal quotation marks and alteration omitted).

Plaintiffs argue that *Smith* overstated the risk of sex-offender recidivism. They note that *Smith* cited several studies on sex offender recidivism. *See id.* at 104. Plaintiffs then rely on an expert declaration critiquing the methodology of the recidivism studies in *Smith*. The district court did not make any factual finding regarding the risk of sex offender recidivism. Even had it adopted the declaration's conclusions as its own, a recalibrated assessment of recidivism risk would not refute the legitimate public safety interest in monitoring sex-offender presence in the community.

### v   Excessive in Scope

In terms of the legislature's tailoring of the law to the legitimate nonpunitive objective, the test is not "whether the legislature has made the best choice possible," but rather "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id.* at 105. The *Smith* Court held that Alaska could "mak[e] reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences." *Id.* at 103. While AB 579 does expand the size of the class subject to regulation, the linking of conviction status to registration is a reasonable nonpunitive regulatory scheme under *Smith*. *Id.*

Plaintiffs' argument that AB 579 is overbroad because it will force many non-dangerous offenders to register is

squarely foreclosed by *Smith*. "The State's determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause." *Id.* at 104.

### vi & vii   Scienter and Application to Behavior Already Criminalized

The *Smith* Court concluded that two of the *Mendoza-Martinez* factors — scienter and application of the law to behavior which is already a crime — were of "little weight." *Id.* at 105. These two factors do not distinguish AB 579 from the law at issue in *Smith*.

As in *Smith*, AB 579 imposes registration requirements only upon a criminal conviction, "a duty not predicated upon some present or repeated violation." *Id.* AB 579 exclusively applies to behavior that is already criminalized under Nevada law. However, as the *Smith* Court concluded, where "recidivism is the statutory concern," application to behavior already criminalized is "a necessary beginning point." *Id.*

**[5]** Evaluating the *Mendoza-Martinez* factors together, we conclude that AB 579 is not so punitive in effect or purpose that it negates the Nevada legislature's intent to enact a civil regulatory scheme. AB 579 does not differ from the law at issue in *Smith* in any fashion that alters the application of that precedent. Plaintiffs' evidence and arguments do not approach the "clearest proof" of punitive purpose or effect required to establish a violation of the Ex Post Facto Clause or Double Jeopardy Clause.

### 2.   Due Process

The district court also enjoined AB 579 as a violation of the Plaintiffs' procedural due process rights under the Fourteenth Amendment. Whether the law would amount to a violation of

procedural due process rights also requires a two-step inquiry: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citations omitted).

Following this framework, the first question is whether Plaintiffs have a liberty interest in remaining free from the sex offender registration and notification requirements of AB 579. While stigma alone is inadequate to affect a liberty interest, stigma plus an alteration in legal status can encroach on a cognizable liberty interest. *Paul v. Davis*, 424 U.S. 693, 711-12 (1976). We have previously held that prison inmates have a liberty interest at stake in the determination of their status as sex offenders. *Neal v. Shimoda*, 131 F.3d 818, 830 (9th Cir. 1997). In *Neal*, the liberty interest stemmed from the stigmatizing consequences of the sex offender label along with "the subjection of the targeted inmate to a mandatory treatment program whose successful completion is a precondition for parole eligibility." *Id.*

**[6]** However, *Smith v. Doe* casts doubt on whether a registration and notification scheme based solely on the fact of a registrant's conviction entails stigmatizing consequences. *Smith* acknowledged that the publication of an offender's identity may cause embarrassment, but held that "these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record." *Smith*, 538 U.S. at 101. We need not resolve this issue, however, "because even assuming, *arguendo*, that [Plaintiffs have] been deprived of a liberty interest, due process does not entitle [them] to a hearing." *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7 (2003).

*Connecticut Department of Public Safety* controls our consideration of whether AB 579 affords the Plaintiffs the pro-

cess they are due. There, the Supreme Court held that sex offenders were not entitled to a hearing on their dangerousness under a Connecticut law that imposed registration requirements based solely on the fact of conviction. *Id.* The Court held that a hearing on an offender's dangerousness was a "bootless exercise" given that "the law's requirements turn on an offender's conviction alone—a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest." *Id.* We have applied *Connecticut Department of Public Safety* in a due process challenge to Alaska's sex offender law, holding that "[l]ike the Connecticut law, Alaska's sex offender statute bases the registration and notification requirements on the sole fact of plaintiffs' convictions. Accordingly, bound by *Connecticut Department of Public Safety*, we hold that Alaska's sex offender registration law does not deprive the Does of procedural due process." *Doe v. Tandeske*, 361 F.3d 594, 596 (9th Cir. 2004) (per curiam) (holding that Alaska's sex offender registration law does not violate procedural or substantive due process).

AB 579, like Connecticut and Alaska's laws, imposes registration and notification requirements based solely on the fact of conviction. Plaintiffs, however, attempt to distinguish *Connecticut Department of Public Safety* and *Tandeske* on the ground that Plaintiffs are requesting a hearing to determine whether or not they were in fact convicted, a factor — unlike actual dangerousness — that is decidedly material under AB 579's statutory scheme.

**[7]** Plaintiffs' argument is unavailing because the fact of conviction is something "that a convicted offender has already had a procedurally safeguarded opportunity to contest." *Connecticut Dep't of Pub. Safety*, 538 U.S. at 7. The Due Process Clause does not entitle an individual to a hearing unless there is "some factual dispute" that a hearing could serve to resolve. *Codd v. Velger*, 429 U.S. 624, 627 (1977) (per curiam). A hearing to ascertain each individual's crime of conviction is a "bootless exercise," *Connecticut Dep't of Pub. Safety*, 538

U.S. at 7, because Nevada sex offenders have already had the fact of their conviction established — with all of the constitutionally required procedural safeguards — through the criminal justice system. "[A]dequate procedural safeguards at the conviction stage are sufficient to obviate the need for any additional process at the registration stage." *United States v. Juvenile Male*, __ F.3d __, 2012 WL 206263, at *13 (9th Cir. 2012).

The cases cited by Plaintiffs do not support their claim because, unlike AB 579, they all involved statutory schemes which allowed the state to label an individual a sex offender even if they had never been convicted of a sexual offense. *See Coleman v. Dretke*, 395 F.3d 216, 223 n.30 (5th Cir. 2004) (holding that individual was entitled to a hearing because he had not had the "original procedurally safeguarded opportunity to contest" a conviction for a sex offense (internal quotation marks omitted)); *State v. Robinson*, 873 So. 2d 1205, 1216 n.8 (Fla. 2004) ("Unlike the defendant in *Doe*, Robinson was not convicted of a crime involving a sexual element or intent. Therefore, unlike that defendant, he did not have a meaningful opportunity to contest whether his offense was sexually related.").

Plaintiffs do accurately note that AB 579 expands the definition of sex offender to include "[a]n offense that is determined to be sexually motivated pursuant to NRS 175.547 or 207.193." AB 579 § 8(r). However, Nevada law requires nearly all of the fundamental protections of the criminal process before a finding of sexual motivation can be made. *See* Nev. Rev. Stat. §§ 175.547, 207.193 (requiring a judicial hearing, the opportunity to present evidence, a "beyond a reasonable doubt" standard of proof, and an on-the-record-decision by the court). These procedural protections go well beyond the minimum requirements of due process. All that is potentially lacking is trial by jury, but a finding by a jury is not required before the state may label an individual a sex offender. *Neal*, 131 F.3d at 831 n.14 (Due Process Clause per-

mits states to "flesh out" the "entity which should conduct [the] hearing" that classifies a prisoner as a sex offender); *see also United States v. Sahhar*, 917 F.2d 1197, 1203 n.6 (9th Cir. 1990) (due process does not require jury trial in civil commitment proceedings).

**[8]** Under AB 579, offenders are required to register as sex offenders only after they have been convicted of a sex offense or found as the result of a judicial hearing to have committed a sexually motivated crime, with all the attendant procedural protections guaranteed by Nevada's criminal justice system. Because AB 579 imposes registration and notification requirements solely on the basis of a fact established with constitutionally adequate procedural protections, no additional hearing is required under the Due Process Clause. *Tandeske*, 361 F.3d at 596.

### 3. Contract Clause

At the conclusion of the September 10, 2008 hearing to determine whether a permanent injunction was appropriate, the court ordered the Plaintiffs to draft an order enjoining the law on the basis of the Ex Post Facto Clause, the Double Jeopardy Clause, the Equal Protection Clause, and the Due Process Clause. The Plaintiffs then drafted an order that without explanation includes a state and federal Contract Clause rationale not previously mentioned by the court. Moreover, the Order does not include any discernable legal rationale or explanation for the added Contract Clause grounds. The Clauses are mentioned in one sentence which simply appends them, without any findings of fact or specific conclusions of law, to a list of constitutional grounds justifying relief. Nevertheless, because the issue as presented is a matter of law, has been fully briefed, and the record is sufficient to do so, we proceed to a decision on this question.

**[9]** We begin with the ACLU's concession that "[t]he Nevada Supreme Court has interpreted the State Constitu-

tional Contracts Clause to be on a par with the U.S. Constitutional Contracts Clause," citing *Holloway v. Barrett*, 87 Nev. 385, 392 (1971). Thus, we turn to Article 1, § 10 of the federal Constitution, which states, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."

*U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 25 (1997), supplies the approach we use in making this determination with respect to public contracts. The factors are: (1) whether the state law has the effect of impairing a contractual obligation; (2) if so, whether that impairment is permitted under the Constitution. In connection with the second question, the Court observed that "it is not every modification of a contractual promise that impairs the obligation of contract under federal law." *U.S. Trust Co.*, 431 U.S. at 16 (quoting *El Paso v. Simmons*, 379 U.S. 497, 506-07 (1965)). *U.S. Trust Co.* also reiterated that a "State has the sovereign right to protect the general welfare of the people" and "we must respect the wide discretion on the part of the legislature in determining what is and what is not necessary." *Id.* at 508-09 (internal quotation marks and alternations omitted). The Court also has said that the Contract Clause notwithstanding,

> [T]he state also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end has the result of modifying or abrogating contracts already in effect. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order.

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434-35 (1934) (internal citation omitted). Moreover, *U.S. Trust Co.* reminds us that "States must possess broad power to adopt general regulatory measures without being concerned that pri-

vate contracts will be impaired, or even destroyed, as a result." *U.S. Trust Co.*, 431 U.S. at 22.

**[10]** With this controlling backdrop in mind, we conclude at the threshold that AB 579 on its face does not perforce impair the plea bargain contracts of those who fall within its scope. As we have already held in our disposition of the Plaintiffs' ex post facto, double jeopardy, and due process challenges, (1) the law is not punitive in intent, (2) it has no overriding punitive effect, (3) it is not the equivalent of historical punishment, (4) and it does not impose upon a registrant any significant affirmative disability or restraint. Moreover, AB 579 has a rational connection to a nonpunitive regulatory purpose and is not excessive in scope. Finally, the law respects the due process rights of those upon whom its requirements fall. *Tandeske*, 361 F.3d 596-97 (holding that Alaska's sex offender registration law did not violate procedural or substantive due process).

Were we to conclude that AB 579 does impair plea bargain contracts, which we do not, we would nevertheless conclude that the impairment is permitted under the Constitution. We would do so for the same reasons previously articulated and because of the importance of this law to the protection of the general welfare of people in Nevada against sexually motivated crimes. Nevada's police power to promote public safety is entitled to respect. A State's law in this context is entitled to a presumption of constitutionality. *Smith*, 528 U.S. at 110 (Thomas, J., concurring).

However, we do note that in individual cases where the state has made an explicit promise to a defendant that the defendant would be exempt from registration as a condition of his guilty plea, that promise — whether memorialized in the terms of the written plea agreement or otherwise proven — is entitled to be enforced against the State. *Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the pros-

ecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."); *see also Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006) (en banc).[5]

## B. Senate Bill 471

Under Article III of the Constitution, federal "courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). A live controversy requires an injury in fact, traceable to the defendant's acts and redressable by a court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). The case or controversy must continue through all stages of federal judicial proceedings. *United States v. Juvenile Male*, ___ U.S. ___, 131 S. Ct. 2860, 2864 (2011) (per curiam). When the possibility of injury to the plaintiffs ceases, the case is rendered moot and we lack jurisdiction to decide it. *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1172-73 (9th Cir. 2009). Even if the parties do not raise mootness as an issue, "federal courts are required sua sponte to examine jurisdictional issues." *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999).

Under the unusual circumstances of this case, we conclude that the question of the constitutionality of retroactive application to Plaintiffs of the residency and movement restrictions of SB 471 may well have been mooted. The State's candid and forthright admission during oral argument that, regardless

---

[5]In *Doe v. Harris*, 640 F.3d 972 (9th Cir. 2011), the Supreme Court of California accepted our request to decide whether "under California law, the default rule of contract interpretation is (a) that the law in effect at the time of a plea agreement binds the parties, or (b) that the terms of a plea agreement may be affected by changes in law." A decision by that court on this issue has not been rendered. We do note as a matter of Nevada state law that a condition of lifetime supervision as a consequence of pleading guilty to a qualifying crime cannot be imposed by a court unless a defendant so pleading is advised of this consequence. *Palmer v. State*, 118 Nev. 823 (2002).

of the outcome of this case, the State does not intend to apply the contested provisions of SB 471 retroactively removes any threat that Plaintiffs or anyone similarly situated will be subject to any deleterious effect or injury from the statute.

Until oral argument, it remained an open question whether the relevant provisions of SB 471 could be applied retroactively. The confusion arose because the relevant provisions of SB 471 are ambiguous as to whether they are to be applied to those whose crimes were committed before October 1, 2007, the law's effective date. For instance, SB 471 states that "if a defendant is convicted of a sexual offense and the court grants probation or suspends the sentence, the court shall" impose the new residency and movement restrictions, depending on the classification of the offender, "as a condition of probation or suspension of a sentence." SB 471 § 2(1). But it is not clear whether these new conditions are to be applied retroactively to all offenders granted probation after October 1, 2007, regardless of when the defendant committed his offense, or only to those whose crimes were actually committed following the law's effective date. By contrast, AB 579 is explicit that its registration requirements apply retroactively. For purposes of the registration requirements, a "sex offender" is "a person who, *after July 1, 1956*, is or has been (a) convicted of a sexual offense . . ." A.B. 579 § 20 (emphasis added).

A law applies "retroactively" for purposes of the Ex Post Facto Clause if it "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, *when committed*." *Collins v. Youngblood*, 497 U.S. 37, 42 (1990) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798)) (emphasis added; emphases in original removed). This is the sense in which we use "retroactive" and "retroactively," regardless of the date when probation was granted or revised.

Before the district court, the State repeatedly maintained that it did not interpret the disputed sections of SB 471 as

applying retroactively. The State said, "Based upon the plain reading of the statutes at issue . . . they are prospective in application." Plaintiffs, however, protested that they had "been unable to get clarity from the AG's office on exactly which portions of SB 471 would be applied retroactively and which won't." They submitted communications with the Attorney General's Office demonstrating that the State had shifted its position several times. The ACLU captured this state of uncertainty in a letter from Maggie McLetchie to Deputy Attorney General Binu Palal dated July 3, 2008:

> As you know, the ACLU reached out to your offices in June, before filing suit, in the hopes of negotiating a temporary stay so that we could resolve those issues with the law where there is no question that the law is unconstitutional on its face, or being applied unconstitutionally. We also hoped that we could get some much needed clarity as to the State of Nevada's interpretation of both AB579 and SB471. Unfortunately, your office was unwilling to consider any stipulated stay whatsoever and we had no choice but to research and file both a complaint and a motion for a temporary restraining order/preliminary injunction motion addressing a myriad of issues with the new sex offender laws.

> While we are now in litigation, it is our hope that we can nonetheless work together to get some clarity as to the State of Nevada's interpretation of the laws and how state agencies have planned to implement them. *For example, if we could come to an agreement that SB 471 will not be applied retroactively, and to whom it will apply, that could greatly help streamline the very-expedited litigation we are now engaged in, and save the ACLU from expending unnecessary additional resources litigating that issue.*

Last Monday, June 30, I reached out to you in advance of the hearing to try to get an answer as to the Attorney General's official position on whether SB471 would or would not apply SB471 [sic] retroactively. While initially you stated that "[t]he Office of Parole and Probation's position is that the residency and movement requirements of SB 471 do not apply retroactively" and that "[your] representation of that office will reflect that position," you later retracted and indicated that your response was "premature" and that "[t]he AG's Office has not issued a formal opinion on this." I did not hear further from you, so I again reached out to you yesterday to get an answer on this issue but I have yet to receive any confirmation as to the Attorney General's formal position.

. . . .

So that we can resolve that confusion without expending any additional legal resources of either the ACLU or the taxpayer-funded budgets of the defendants, please provide confirmation as to the Attorney General's position on SB471 no later than the close of business (5 p.m.) today. Please feel free to call me to discuss the matter. I look forward to hearing from you.

(emphasis added).

Mr. Palal's timely answer the same day was, "At this time, the Office of the Attorney General has not taken a position as to the retroactivity of the numerous provisions contained in SB 471."

Thirteen days later, on July 16, 2008, Mr. Palal wrote to Ms. McLetchie again, this time stating that, "It is the position of this office that the mechanism provided to employ the pro-

visions of SB 471 only allows for prospective application. Therefore, the position of this office is that the statutes stemming from SB 471 will be applied prospectively." However, the next day, Mr. Palal in another letter appeared to take a step back from this position, this time stating that the only provision of SB 471 that did not apply retroactively was its "requirements concerning residency within 1000 feet of a school or daycare facility."

All of this back and forth notwithstanding, the ACLU represented to the court in August 2008 that "Defendants have finally conceded that S.B. 471 cannot be applied retroactively," and they dismissed certain claims because, "Now, . . . SB 471 will no longer be applied retroactively." However, the ACLU understandably asked for a formal court order to this effect citing inter alia 28 U.S.C. § 2201(a) regarding a binding declaration of rights.

In the district court, Plaintiffs introduced affidavits from several Doe plaintiffs, all of whom were convicted well before the law's effective date, indicating that they had been notified by their parole officers that they *would* be required to comply with SB 471's residency restrictions. The State did not introduce any contrary evidence and opposed discovery in the case. With the case in that posture, the district court appropriately recognized that the retroactive application of SB 471 was an unresolved justiciable controversy, Mr. Palal's letter of July 16 notwithstanding.[6]

In its briefing before us, the State maintains that SB 471's residency and movement restrictions, as a matter of its interpretation of the statutory language, cannot apply retroactively. In its reply brief, for example, the State advised us that "lifetime supervision residency requirements, parole, and proba-

---

[6]The State never packaged its interpretation of SB 471 as an issue of justiciability. It made the argument in response to a vagueness challenge not at issue here.

tion terms found in SB 471 all specifically call for a contemporaneous order from the [sentencing] court and cannot be employed retroactively." The State also represented that it had "throughout litigation maintained that SB 471, in its relevant pieces, is prospective and not retroactive." However, the State has not raised mootness as an issue.

During oral argument, the State acknowledged that Plaintiffs introduced evidence that Nevada probation and parole officers may have represented to probationers and parolees that SB 471 would apply retroactively to them. In a formal colloquy with the court, the State conceded that any attempt by state parole officers to apply the residency and movement restrictions retroactively was an error in State oversight and that in the future there was no possibility that the restrictions would be applied retroactively. The culmination of the exchange was the State's response to the court's question:

> The court: Well, would you agree to represent to this court that if the parole officers said that [Plaintiffs were required to comply with SB 471's residency and movement conditions], the State in that event apologizes to clients of the ACLU and undertakes to never have that happen again?
>
> The State: Absolutely.

Normally a state Attorney General's interpretation of state law, advanced during the course of litigation, is not authoritative and would not be sufficient to moot a live case or controversy. *See Stenberg v. Carhart*, 530 U.S. 914, 940 (2000); *see also Tahoe Reg'l Planning Agency v. McKay*, 769 F.2d 534, 539 (9th Cir. 1985) (Nevada Attorney General's interpretation of state law does not bind state courts). As recognized by the district court, a state Attorney General is generally free to advance an interpretation of a statute during litigation that a

subsequently appointed Attorney General may choose to disavow. And like any litigant, a state Attorney General may make a tactical choice to present two conflicting positions as an argument in the alternative.

[11] Nevada's statement in this case, however, constitutes a binding judicial admission because the State went beyond a simple expression of its legal position regarding the interpretation of SB 471. The State represented, as a matter of law, that it had no authority under SB 471 to apply its movement and residency restrictions retroactively and that it will "absolutely" not do so in the future. *See United States v. Wilmer*, 799 F.2d 495, 502 (9th Cir. 1986) (representation at oral argument is judicial admission). A litigation position such as this conveyed to a court becomes binding in any forum in which the same controversy arises. *New Hampshire v. Maine*, 532 U.S. 742 (2001) (the doctrine of judicial estoppel prohibits a party from "changing positions according to the exigencies of the moment" (internal quotation marks omitted)); *Helfand v. Gerson*, 105 F.3d 530 (9th Cir. 1997) (a party taking a position in litigation precludes that party from later assuming an inconsistent position on the same issue). The State, like any party, is responsible for official representations that it makes to the court. *United States v. Crawford*, 372 F.3d 1048, 1055 (9th Cir. 2004) (en banc) ("A judicial admission is binding before both trial and appellate courts."). The State's judicial admission that the residency and movement restrictions of SB 471 "ought not [be] and are not" being applied retroactively is therefore binding. This judicial admission appears to moot the issue that was argued before us: whether retroactive application of SB 471's residency and movement restrictions could constitutionally be applied retroactively.

[12] In fine, the State's clarification of its official position on this statute removes any potential of deleterious effect or injury to Plaintiffs and divests us of a live case or controversy. As Judge Wood said in *United States v. Leach*, 639 F.3d 769, 773 (7th Cir. 2011), "Because the law targets only the conduct

undertaken by convicted sex offenders after its enactment, it does not violate the Ex Post Facto Clause." (citing *Weaver v. Graham*, 450 U.S. 24, 29 (1981)). We do note that the State limited its concession to the residency and movement restrictions of SB 471, saying that "Nevada, in interpreting its own laws, concluded that movement and residency restrictions contained SB 571 [sic] cannot be applied retroactively." We will hold the State to its categorical representation.

The "normal rule" when a case is mooted is that vacatur of the lower court decision is appropriate. *Camreta v. Greene*, __U.S.__, 131 S. Ct. 2020, 2035 (2011). That is the default approach because it "prevent[s] a judgment, unreviewable because of mootness, from spawning any legal consequences." *United States v. Munsingwear, Inc.*, 340 U.S. 36, 41 (1950).

There is an exception to the *Munsingwear* rule, however, when the "party seeking relief from the judgment below caused the mootness by voluntary action." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994); *see also Ringsby Truck Lines, Inc. v. Western Conference of Teamsters*, 686 F.2d 720, 722 (9th Cir. 1982) (recognizing exception to automatic vacatur "when the appellant has by his own act caused the dismissal of the appeal"). In *U.S. Bancorp*, the appellant had voluntarily mooted the issue on appeal through entering into a settlement. *Id.* at 20. The Supreme Court held that when appealing parties voluntarily forfeit their right to appeal and receive a decision on the merits, they also surrender their claim to "the equitable remedy of vacatur." *Id.* at 25. In those circumstances, the court " 'may not consider [the] merits, but may make such disposition of the whole case as justice may require.' " *Id.* at 21 (quoting *Walling v. James V. Reuter, Co., Inc.*, 321 U.S. 671, 677 (1944).

The *U.S. Bancorp* exception applies in this case. The State appealed the permanent injunction placed on retroactive application of SB 471, but then unilaterally bound itself

through a judicial admission that mooted the controversy as to retroactive application now before this court. As in *U.S. Bancorp*, the live case was resolved by the strategic decision of the appealing party rather than mere happenstance. *See id.* Accordingly, because "the party seeking relief from the judgment below caused the mootness by voluntary action" we retain the authority to dispose of the case in the manner "most consonant to justice." *Id.* at 24 (internal quotation marks omitted).

When a case has been mooted by the appellant's own actions, the Supreme Court has directed that appellate courts should vacate the district court order only in "exceptional circumstances." *Id.* at 29. Our "established procedure" is to remand to the district court so it may balance the relevant equitable concerns and decide whether to vacate its judgment. *Dilley v. Gunn*, 64 F.3d 1365, 1370 (9th Cir. 1995).

In this case, we conclude that Nevada's concession regarding the application of SB 471's disputed provisions, both facially and as applied, would most appropriately be captured in a binding and enforceable comprehensive consent decree fashioned by the parties with the approval of the court and covering *all* agencies responsible for enforcing SB 471 and all the relevant provisions of the law. This result is precisely what the ACLU requested from the Attorney General in its letter of July 3, 2008 and would eliminate the district court's concerns about a subsequent administration changing its position. We note that several defendants were dismissed from the case based on the stipulation that they would abide by the decision of the district court. Moreover, our suggested resolution, which eliminates the Contract Clause challenge, is consistent with the prudential rule that we should avoid deciding a constitutional issue unless necessary to resolve a controversy. *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reach-

ing constitutional questions in advance of the necessity of deciding them.").

**[13]** Accordingly, trusting that the litigants will work together to fashion appropriate relief, and in view of the State's stated position that SB 471 will not be applied retroactively, we dismiss as moot the State's appeal of the district court's ruling on SB 471. Therefore, the injunction against retroactive application of SB 471, for the time being, remains in effect. We remand to the district court for further proceedings consistent with Nevada's representation regarding SB 471

## C. Stay on Payment of Attorneys' Fees

The State separately appeals the district court's denial of its request for a stay on payment of attorneys' fees pending appeal under Federal Rule of Civil Procedure 62(d). Had the State complied with the express requirements of Rule 62(d) by appealing the underlying fees order and posting a supersedeas bond with the district court, it would have been entitled to a stay as a matter of right. *In re Combined Metals Reduction Co.*, 557 F.2d at 193. But the State did not appeal the fees order or post a supersedeas bond, and therefore "the grant or denial of the stay[ ] was a matter strictly within the judge's discretion." *Id.*

**[14]** The State fails to identify any instance in which the court supposedly abused its discretion. The judge justified his denial based on the State's failure to comply with the express requirements of Rule 62(d). The court properly exercised its discretion in doing so. *See, e.g., Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1043 (9th Cir. 2011) (party's failure to comply with procedural rules sufficient grounds for court's exercise of discretion denying their motion).

## IV

## CONCLUSION

**[15]** We reverse the district court with respect to the injunction placed on retroactive application of AB 579. With respect to SB 471, we dismiss the appeal as moot in view of the State's representation that it will not apply retroactively the relevant provisions of SB 471, and we remand to the district court to consider whether to vacate the injunction order and to replace it with a binding consent decree. We affirm the district court's order denying a stay on payment of attorney's fees.

Appeal No. 08-17471 is REVERSED in part, DISMISSED AS MOOT in part, and REMANDED. Each party shall bear its own costs. Appeal No. 09-16008 is AFFIRMED.