BILES, J.,
concurring in part and dissenting in part: I agree with the majority that our legislature intended for the Kansas Offender Registration Act (KORA) and its 2011 amendments to be a civil regulatory scheme for public safety that was nonpunitive. I also agree the proper retroactivity test boils down to whether the 2011 amendments that prompt the present controversy render KORA so punitive as applied to sex offenders as to negate that intent. See Smith v. Doe, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d *329 164 (2003) (applying intent-effects test for federal Ex Post Facto Clause purposes). Our state constitution does not contain a similar provision or suggest a different analytical process. See State v. Todd, 299 Kan. 263, 276, 323 P.3d 829 (2014) (no Ex Post Facto Clause in Kansas Constitution).
Rut this just means we are being asked to answer a federal question, which logically suggests adhering to the federal law on this subject. My colleagues in the majority too easily disregard the substantial federal caselaw that yields a contrary result from the one reached today. This caselaw uniformly concludes that the federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 et seq. (2012), as well as offender registration laws from other states, are nonpunitive and may be applied retroactively without violating the federal Ex Post Facto Clause. This authority sets the path we must follow.

Standard of review

Our standard of review is well known when considering a challenge to a statutes constitutionality; yet its recitation in the majority opinion tellingly ignores critical components, namely: we always presume legislative enactments are constitutional and we resolve all doubts in favor of a statute s validity. State v. Cheeks, 298 Kan. 1, 4, 310 P.3d 346 (2013); Board of Miami County Comm’rs v. Kanza Rail-Trails Conservancy, Inc., 292 Kan. 285, 315, 255 P.3d 1186 (2011). This presumption of constitutionality emanates from the critical doctrine of separation of powers, which recognizes that courts are concerned only with the legislative power to enact statutes — not with the wisdom behind them. Miller v. Johnson, 295 Kan. 636, 646, 289 P.3d 1098 (2012).
We do not declare a statute unconstitutional unless it is clear beyond a reasonable doubt that the statute infringes on constitutionally protected rights. State v. Carr, 300 Kan. 1, 285, 331 P.3d 544 (2014) (quoting State v. Brown, 280 Kan. 898, 899, 127 P.3d 257 [2006]). And as the United States Supreme Court noted in Smith, “ ‘only the clearest proof’ ” of punitive effect is sufficient to override the legislatures intent to create a civil regulation. Smith, 538 U.S. at 91 (quoting Hudson v. United States, 522 U.S. 93, 100, 118 S. Ct. *330 488, 139 L. Ed. 2d 450 [1997]); see also United States v. Young, 585 F.3d 199, 2005 (5th Cir. 2009) (“[Y]oung must present the ‘clearest proof’ that either the purpose or the effect of [SORNA] is in fact so punitive as to negate its civil intent. This he cannot do.”).
The majority’s analysis deviates from these principles by framing the question as an examination into whether differences between KORA and the Alaska statute the United States Supreme Court upheld in Smith “mandates a different result.” 304 Kan. at 316. But viewing tire controversy in this way ignores the presumption of constitutionality, resourcefully casts off the numerous decisions cited below that have upheld various registration requirements against federal retroactivity challenges, and renders meaningless the “clearest proof’ standard stated in Smith. The majority’s stated reason for this approach is that federal circuit court opinions are not binding on state supreme courts, so the majority will not consider whether their holdings may inform our thinking. This smacks of simply being a means to a predetermined end.

Discussion

The Ex Post Facto Clause of the United States Constitution prohibits state and federal governments from retroactively imposing additional punishment for a criminal offense. U.S. Const, art. I, §§ 9-10. As noted, Kansas does not have a comparable constitutional dictate. See Todd, 299 Kan. at 276.
Federal appellate courts have unanimously held retroactive application of the federal offender registration requirements found in SORNA does not violate the Ex Post Facto Clause. United States v. Brunner, 726 F.3d 299, 303 (2d Cir. 2013); United States v. Parks, 698 F.3d 1, 5-6 (1st Cir. 2012); United States v. Felts, 674 F.3d 599, 606 (6th Cir. 2012); United States v. Elkins, 683 F.3d 1039, 1045 (9th Cir. 2012); United States v. Leach, 639 F.3d 769, 773 (7th Cir. 2011); United States v. W.B.H., 664 F.3d 848, 860 (11th Cir. 2011); United States v. Shenandoah, 595 F.3d 151 (3d Cir.), cert. denied 560 U.S. 974 (2010), abrogated on other grounds by Reynolds v. United States, 565 U.S. _, 132 S. Ct. 975, 181 L. Ed. 2d 935 (2012); United States v. Gould, 568 F.3d 459, 466 (4th Cir. 2009), cert. denied 559 U.S. 974 (2010); Young, 585 F.3d at *331 206 (noting that Young made no “effort to prove that the effect of SORNA is so punitive as to malee it not a civil scheme, and any attempt to do so would have been futile”); United States v. May, 535 F.3d 912, 919-20 (8th Cir. 2008), cert. denied 556 U.S. 1258 (2009), abrogated on other grounds by Reynolds, 132 S. Ct. 975; United States v. Hinckley, 550 F.3d 926, 937-38 (10th Cir. 2008), abrogated on other grounds by Reynolds, 132 S. Ct. 975 (2012); see also United States v. Under Seal, 709 F.3d 257, 265 (4th Cir. 2013) (applying Mendoza-Martinez factors to hold SORNA was not cruel and unusual punishment as applied to a juvenile); United States v. Stacey, 570 Fed. Appx. 213, 216 (3d Cir. 2014) (holding ex post facto challenge to conviction for failing to register under SORNA foreclosed by Shenandoah); United States v. Sampsell, 541 Fed. Appx. 258, 260 (4th Cir. 2013) (holding ex post facto challenge to SORNA foreclosed by Gould).
In addition, federal circuit courts have upheld state sex offender registration laws against federal ex post facto challenges, even when those state laws contained provisions more expansive in scope and impact than either SORNA or the Alaska provisions addressed in Smith. See Litmon v. Harris, 768 F.3d 1237, 1242-43 (9th Cir. 2014) (upholding California requirement that offenders register in-person every 90 days); American Civil Liberties Union of Nevada v. Masto, 670 F.3d 1046, 1051, 1058 (9th Cir. 2012) (upholding Nevada law expanding category of individuals who must register, increasing time period offenders were subject to registration, adding in-person registration requirements, and expanding law enforcement obligations to notify specified entities that an offender resided nearby); Doe v. Bredesen, 507 F.3d 998, 1000 (6th Cir. 2007) (upholding Tennessee law requiring, among other things, extended lifetime registration and satellite-based monitoring with wearable GPS device); Hatton v. Bonner, 356 F.3d 955, 967 (9th Cir. 2004) (upholding California law containing several provisions different from the Alaska statute analyzed in Smith).
The majority disingenuously characterizes this unanimous body of caselaw as just the decisions of “a number of Federal Circuit Courts of Appeal,” which it then discounts by noting the obvious, i.e., there are differences between the federal SORNA and our *332 state’s KORA. 304 Kan. at 327-28. And while it is true that none of the statutoiy schemes upheld by other courts are identical to KORA, there is substantial overlap, and so the rationale from those decisions should apply with equal force here. I would not so quickly disdain this federal caselaw because it compellingly answers the real question presented: Are there convincing reasons to believe the United States Supreme Court would view KORA differently than it viewed the Alaska law in 2003 when it decided Smith? See Litmon, 768 F.3d at 1243 (“[T]here is no reason to believe that the addition of [the 90-day, in-person registration] requirement would have changed the outcome [in Smith].”). If the answer to that question is no, then this court must affirm.
To answer the question presented, we apply the two-step test from Smith to determine whether the 2011 KORA amendments constitute an additional form of punishment when applied to offenders required to comply with them because of convictions that occurred before the amendments were enacted. See Smith, 538 U.S. at 92. And as noted, the majority correctly concludes in the first step that the Kansas Legislature intended for its 2011 amendments to preserve KORA’s status as a civil regulatory scheme. 304 Kan. at 317. After that, we move to the second step, where we must decide whether those 2011 amendments are “‘“so punitive either in purpose or effect as to negate [die State’s] intention” to deem [KORA] “civil.”’” Smith, 538 U.S. at 92. This is where I depart from the majority’s analysis.
For this second step, we should follow the federal factors laid out in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963). See Smith, 538 U.S. at 97. Those factors consider the degree to which the regulatory scheme imposes a sanction that: (1) has historically been regarded as punishment; (2) constitutes an affirmative disability or restraint; (3) promotes the traditional aims of punishment; (4) is rationally connected to a nonpunitive purpose; (5) is excessive in relation to the identified nonpunitive purpose; (6) contains a sanction requiring a finding of scienter; and (7) applies the sanction to behavior that is already a crime. Mendoza-Martinez, 372 U.S. at 168. In Smith, the Court focused on the first five as more relevant in evaluating Alaska’s reg *333 istration and notification law, concluding the remaining two were of “little weight.” 538 U.S. at 105. I will do the same.
Historical Form of Punishment
The majority holds that the 2011 KORA “crosses the fine drawn by Smith” by too closely resembling the shaming punishments from the colonial period. 304 Kan. at 321. KORA does this, according to the majority, by posting the registrant’s information on the Internet, “branding” a registrants drivers license with the letters “RO,” and requiring quarterly registration in each location where an offender works, lives, or attends school. Lets take each of these in turn.

Posting offender information on the Internet

As summarized below, there is overwhelming federal authority holding that Internet posting of registrant information is not analogous to historical forms of punishment. The analysis used to reach that conclusion applies in equal force to KORA, regardless of other differences the statutory schemes may have. The majority overreaches by rejecting this caselaw and adopting a contrary view.
In Smith, the United States Supreme Court held that Alaska’s offender registration act could apply retroactively and “[t]he fact that Alaska posts the information on the Internet does not alter our conclusion.” 538 U.S. at 99. The Court held the posting requirement was not akin to historical punishments despite recognizing that it subjects the offender to public shame or humiliation because most of the information related to an already public criminal record and dissemination of it furthers a legitimate governmental objective. 538 U.S. at 99. The Smith Court explained:
“[T]he stigma of Alaska’s Megan’s Law results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment. On the contrary, our criminal law tradition insists on public indictment, public trial, and public imposition of sentence. Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting tire rights of tire accused. The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment *334 to social ostracism. In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.” 538 U.S. at 98-99.
The Smith Court then added:
“The fact that Alaska posts the information on the Internet does not alter our conclusion. It must be acknowledged that notice of a criminal conviction subjects the offender to public shame, the humiliation increasing in proportion to the extent of the publicity. And the geographic reach of the Internet is greater than anything which could have been designed in colonial times. These facts do not render Internet notification punitive. The puipose and the principal effect of notification are to inform the public for its own safety, not to humiliate tire offender. Widespread public access is necessary for the efficacy of the scheme, and tire attendant humiliation is but a collateral consequence of a valid regulation.” 538 U.S. at 99.
In so holding, the Court’s analysis recognizes the obvious — posting information on the Internet makes it far more accessible and subjects tire offender to increased shame and humiliation. Nevertheless, the Court held that Internet posting did not make Alaska’s statutory scheme punitive.
The majority characterizes the Smith Court’s 2003 analysis of the Internet as “antiquated,” and then concludes: “Any suggestion that disseminating sex offender registration [information] on an Internet website reaches no more members of the public and is no more burdensome to the offender than maintaining an archived criminal record simply ignores the reality of today’s world.” 304 Kan. at 321-22.
But as seen from its holding, Smith did not base its conclusion on some old-fashioned, dial-up modem/floppy disk notion of the World Wide Web; nor did it consider accessing offender information on the Internet nothing more than a walk to the courthouse to thumb through publicly available paper files. Smith’s rationale withstands the more recent development of a mobile, smartphone Internet. Indeed, these developments can be viewed as furthering the nonpunitive, public safety ends supporting offender registration because, as Smith acknowledged, “[widespread public access is necessary for the efficacy of the scheme.” Smith, 538 U.S. at 99. The majority simply disagrees with the Court’s conclusion but needs a rationale for considering the question further. This *335 becomes overwhelmingly evident when tire authority from more recent courts applying Smith is acknowledged.
Consider first the federal notification statute, SORNA. Similar to KORA, the federal law requires that offender information including the offenders’ names, physical descriptions, photographs, criminal offenses, and criminal histories be made publicly available on the Internet. See 42 U.S.C. §§ 16914,16918-16920 (2012). Under SORNA, the states and enumerated territories, including the District of Columbia and Puerto Rico, must each maintain websites for this purpose. See 42 U.S.C. §§ 16911(10); 16918(a) (2012). The federal government, in turn, must maintain a website containing “relevant information for each sex offender and other person listed on a jurisdictions Internet site.” 42 U.S.C. § 16920. Each of these websites must make the information obtainable “by a single query for any given zip code or geographic radius set by the user.” 42 U.S.C. §§ 16918(a), 16920(b). And among SORNA’s others mandates, an appropriate official must affirmatively distribute notice of an individual’s sex offender status to “each school and public housing agency” in the area where that sex offender resides. 42 U.S.C. § 16921(b)(2) (2012). In short, SORNA goes further than the Alaska scheme at issue in Smith and further than KORA as to affirmative notification of statutorily specified groups.
Nevertheless, all federal circuits addressing whether SORNA’s publication requirements are punitive have followed Smith and held they are not, despite candidly recognizing they can result in greatly increased public shame. See, e.g., Parks, 698 F.3d at 5-6 (noting the disadvantages from the publicity attendant to SORNA’s Internet requirements “are obvious” and refusing to invalidate SORNA due to “wide dissemination” of offender’s information, citing Smith); Hinckley, 550 F.3d at 937-38 (“SORNA, just as the Smith scheme, merely provides for the ‘dissemination of accurate information about a criminal record, most of which is already public’”); see also United States v. Talada, 631 F. Supp. 2d 797, 808 (S.D. W. Va. 2009) (citing Smith and upholding SORNA as a valid regulatory program even though it requires widespread Internet dissemination of offenders’ information, a community notification program, and in-person reporting).
*336 Also persuasive is the Ninth Circuit’s 2012 decision upholding retroactive application of a Nevada statute that, among other things, not only required Internet publication of registration information, but also active notification to specified groups over and above what was required by SORNA, such as youth and religious organizations. Masto, 670 F.3d at 1051. In rejecting any notion that these features were akin to historical forms of punishment, the Ninth Circuit held:
“Active dissemination of an individual’s sex offender status does not alter the [Smith] Court’s core reasoning that ‘stigma ... results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public.’ [Citation omitted.] Though ‘humiliation increasfes] in proportion to the extent of the publicity,’ the ‘purpose and the principal effect of notification are to inform the public for its own safety.’ [Citation omitted.]” 670 F.3d at 1056.
There is also recent state court authority, relying heavily on Smith, that holds posting registered offenders’ information on the Internet is not aldn to traditional shaming punishments. See Kammerer v. State, 322 P.3d 827, 834-36 (Wyo. 2014) (“Although dissemination of information relating to a registrant’s status as a sex offender may have negative consequences for the registrant, information regarding the offense is made public at the time of trial, and its publication under WSORA is merely a necessary consequence of the Act’s intent to protect the public from harm.”); State v. Letalien, 2009 ME 130, ¶ 38, 985 A.2d 4 (2009) (Internet posting of sex offender information is not punitive in purpose or effect, citing Smith-, Maine and federal Ex Post Facto Clauses are coextensive); see also Doe I v. Williams, 2013 ME 24, ¶ 35, 61 A.3d 718 (2013) (following Letalien).
I would follow this abundant caselaw and hold that KORA’s Internet posting of information is not aldn to historical shaming punishments. And in reaching that conclusion, I would further note the majority’s discussion of the sharing functions available on the Johnson County Sherriff’s website is irrelevant to the statute’s constitutionality because KORA does not require this capability; and, just as importantly, the majority cites no authority that would find a federal ex post facto violation because of a nonstatutorily mandated software feature added by a local law enforcement agency.
*337 Regardless, given the overwhelming weight and substance of the caselaw rejecting federal ex post facto challenges based on widespread Internet dissemination of offender registration information, as well as the federal courts3 more recent validations of Smith, I would not consider Smith’s rationale to be “antiquated33 or subject to easy dismissal, and I would not weigh this against the statute’s constitutionality. The majority errs in this regard.

“Branding” a registrant’s driver’s license

Next, the majority declares that KORA “mimics [the] shaming of old by branding the drivers license of a registrant with the designation, ‘RO.'" 304 Kan. at 321. The majority is referring to K.S.A. 2011 Supp. 8-243, which provides that an offenders drivers license “shall be assigned a distinguishing number by the division [of motor vehicles] which will readily indicate to law enforcement officers that such person is a registered offender. The division shall develop a numbering system to implement the provisions of this subsection.33 This requirement, while not technically contained in KORA, differentiates Kansas laws from SORNA, although the statute only requires a distinguishing number and the “RO33 practice is just a decision by a state agency that is not specifically dictated by the statute. See K.S.A. 2011 Supp. 8-243(d).
The majority draws support for its view from a divided decision in Starkey v. Oklahoma Dept. of Corrections, 2013 OK 43, 305 P.3d 1004 (2013), which considered the Oklahoma Constitution’s Ex Post Facto Clause. See Okla. Const., art. 2, § 15. But I do not find Starkey persuasive for several reasons.
First, although the Oklahoma Supreme Court applied the intent-effects test, that courts majority suggests they applied a lower standard as to when the effects of a measure are punitive under the Oklahoma Ex Post Facto Clause by noting that the United States Constitution simply establishes a floor for constitutional rights in Oklahoma. 2013 OK 43, ¶ 45 (“How we apply the Intent-effects’ test is not governed by how the federal courts have independently applied the same test under the United States Constitution as long as our interpretation is at least as protective as the federal interpretation.33). Second, Oklahoma's offender registry law imposed *338 harsher restraints on offenders because of residency boundaries (minimum distance from schools, playgrounds, etc.) and a requirement that Oklahoma driver’s licenses and identification cards spell out the term “Sex Offender.” In contrast, KORA contains no residency exclusions and Kansas simply uses as a matter of state agency practice an abbreviation (RO), which applies equally to non-sex-offenders. Finally, tire Starkey court relied upon the totality of the Oklahoma law’s harsher circumstances when determining they weighed in favor of punishment. 2013 OK 43, ¶ 61 (“[W]e are not making a determination of the constitutionality of any of tírese individual registration requirements but for purposes of analyzing the second Mendoza-Martinez factor we find the totality of these requirements weigh in favor of punishment.”).
Offering a different analysis, the Louisiana Supreme Court’s unanimous decision in Smith v. State, 84 So. 3d 487 (La. 2012), reached tire opposite conclusion regarding its driver’s license labeling and is more on point. In so holding, the Louisiana court acknowledged that including the words “sex offender” printed in orange color on an offender’s driver’s license “may be remotely similar to historical forms of punishment, such as public humiliation, [but] the immediate need for public protection was a corollary of, rather than an addendum to, tire punishment for sex offenders.” Smith, 84 So. 3d at 496 n.7-8, 498. The.court tiren concluded that the requirement of a notation on an offender’s driver’s license “may be harsh, may impact a sex offender’s life in a long-lived and intense manner, and also be quite burdensome to the sex offender, [but] we do not find them to constitute an infringement of the principles of ex post facto.” 84 So. 3d at 499.
Admittedly, the Louisiana court did not articulate whether it was relying on the federal or state constitution for its holding, but this does not appear to make a difference because that court had previously held Louisiana’s Ex Post Facto Clause offers the same protections because it was patterned after the United States Constitution. See State ex rel. Olvieri v. State, 779 So. 2d 735 (La. 2001). For this reason, I find the Louisiana decision more persuasive than the Oklahoma decision.

*339
Quarterly registration

Next, the majority labels KORAs quarterly, in-person registration requirements for each location where the offender works, lives, or attends school as “a traditional means of punishment” by likening the requirement to probation or parole. 304 Kan. at 322. It does so without citation to any authority or explanation as to how quarterly reporting mandates offend federal ex post facto caselaw. Again, a review of the unanimous federal caselaw upholding SOR-NA is persuasive and leads to a contrary conclusion.
SORNA’s in-person reporting requirements differentiate between types of sex offenses in determining the frequency of in-person reporting. There must be in-person verification “not less frequently than” once a year for Tier I sex offenders, twice a year for Tier II sex offenders, and four times per year for Tier III sex offenders. 42 U.S.C. § 16916 (2012); see 42 U.S.C. § 16911 (defining Tiers I, II, and III). In Parks, the First Circuit recently noted SORNAs in-person requirement was “surely burdensome for those subject to it,” but nevertheless concluded this was not punitive, noting:
“To appear in person to update a registration is doubtless more inconvenient than doing so by telephone, mail or web entry; but it serves the remedial purpose of establishing that the individual is in tire vicinity and not in some other jurisdiction where he may not have registered, confirms identity by fingerprints and records the individual’s current appearance. Further, tire inconvenience is surely minor compared to the disadvantages of tire underlying scheme in its consequences for renting housing, obtaining work and tire like — consequences that were part of tire package that Smith itself upheld.” 698 F.3d at 6.
See Doe v. Pataki, 120 F.3d 1263, 1281-82 (2d Cir. 1997); see also Doe v. Cuomo, 755 F.3d 105, 112 (2d Cir. 2014) (approving triennial, in-person reporting as being reasonably related to the nonpu-nitive, prospective goals of protecting the public and facilitating law enforcement efforts).
Admittedly, KORAs reporting requirements are more burdensome than those in SORNA because under KORA, all sex offenders are subject to in-person registration four times per year, and drug and violent offenders must report in person a minimum of three times per year. K.S.A. 2011 Supp. 22-4905(b). KORA fur *340 ther requires an offender to report registration changes in person “to the . . . agency or agencies where last registered.” (Emphasis added.) K.S.A. 2011 Supp. 22-4905(a), (g). In addition, the definition of “reside” in KORA is broader than the definition in SORNA. Compare K.S.A. 2011 Supp. 22-4902(j) (definition of “reside”) with SORNAs 42 U.S.C. § 16911. Therefore, it is obvious KORA imposes a greater registration burden on the offender than SORNA. But the question is whether the federal courts would view these changes as tipping the balance. I think not.
Consider again as an example Matso in which the Ninth Circuit rejected a federal ex post facto challenge to a Nevada law that essentially mirrored SORNAs registration requirements, but also expanded the category of individuals required to register, added to the frequency offenders were subject to registration, and required in-person registration. Matso, 670 F.3d at 1051; see also Litmon, 768 F.3d at 1242-43 (holding California’s 90-day, in-person lifetime registration requirement does not violate federal ex post facto principles); Hatton, 356 F.3d at 965 (no evidence California’s registration requirement has an objective to shame, ridicule, or stigmatize sex offenders). These decisions strongly point in a direction that indicates KORA’s reporting requirements do not offend federal ex post facto principles.
Additionally, the majority’s analogy to probation is not persuasive. While probation/parole may have “reporting” in common in the abstract, this is only one aspect of many conditions attached to tírese punishments. For example, probationers are subject to searches of their persons and property simply on reasonable suspicion of a probation violation or criminal activity and are subject to random drug tests. They may also be required to avoid “injurious or vicious habits” and “persons or places of disreputable or harmful character”; permit state agents to visit their homes; remain in Kansas unless given permission to leave; work “faithfully at suitable employment”; perform community service; go on house arrest; and even serve time in a county jail. K.S.A. 2011 Supp. 21-6607(b), (c).
In sum, I do not believe the federal courts, more specifically the United States Supreme Court, would hold that this historical-form-of-punishment factor weighs toward an ex post facto violation.
*341 Affirmative Disability or Restraint
The majority focuses next on what it characterizes as the “more common restraint on an offenders freedom of movement” under KORA, which is the quarterly registration requirement in each applicable jurisdiction and the required $20 registration fee, as well as tire KORA’s broader definition of the word “resides.” 304 Kan. at 323. The majority notes the registration costs, depending on circumstances, could be $80 to $240 annually.
Rut the majority fails to explain how the federal courts would hold that these components of KORA would weigh this factor against the Kansas law. For example, no evidence was presented establishing that the KORA registration costs were a fine instead of a fee. See Mueller v. Raemisch, 740 F.3d 1128, 1134 (7th Cir. 2014) (“The burden of proving that it is a fine is on the plaintiffs . . . .”).
In Mueller, the Seventh Circuit recently upheld Wisconsin’s annual $100 registration fee against a sex offender who moved out-of-state but was still required to register in Wisconsin. In doing so, the court noted first that plaintiff had done nothing to get over the first hurdle by presenting evidence regarding the fee versus the registration programs cost. 740 F.3d at 1134 (“[Tjhey cannot get to first base without evidence that it is grossly disproportionate to the annual cost of keeping track of a sex offender registrant — and they have presented no evidence of that either. They haven’t even tried.”). Similarly, Doe has done nothing as to this evidentiary hurdle, yet the majority strikes this factor against KORA even though the burden is on the challenger and the statute is presumed constitutional.
Second, the Seventh Circuit noted the nonpunitive purpose of collecting fees and where the responsibility lies for having to provide a registry, stating:
“The state provides a service to the law-abiding public by maintaining a sex offender registry, but there would be no service and hence no expense were there no sex offenders. As they are responsible for the expense, there is nothing punitive about requiring them to defray it.” 740 F.3d at 1135.
If it is tire potential for a total annual cost of $240 that offends the majority, what is the legal basis for that? The majority leaves this unexplained.
*342 Next, the majority holds that housing and employment problems result from the registry, which ties back to the widespread dissemination of information on tire Internet discussed above, which Smith and the other federal courts have plainly rejected. But the majority believes KORA suffers an additional evidentiary blow because of direct evidence that Doe actually lost a job and housing opportunities because of the Internet registry. I disagree this tips the balance when the caselaw is considered.
As noted earlier, my review of federal caselaw from Smith on down shows the courts have fully understood that actual consequences result from offender registration and have not dismissed these consequences simply as conjecture. See, e.g., Smith, 538 U.S. at 99; Parks, 698 F.3d at 6 (“The prospective disadvantages to Parks from such publicity are obvious.”). Indeed, several courts have approved state laws that imposed actual residential living restrictions on offenders, which are literally off-limits zones disabling offenders from living in close proximity to schools, playgrounds, etc. See Doe v. Miller, 405 F.3d 700 (8th Cir. 2005) (Iowa’s 2,000-foot buffer zone regulatoiy, not punitive); Salter v. State, 971 So. 2d 31 (Ala. Civ. App. 2007) (approving 2,000-foot buffer zone); People v. Leroy, 357 Ill. App. 3d 530, 828 N.E.2d 769 (2005) (approving 500-foot buffer zone); State v. Seering, 701 N.W.2d 655 (Iowa 2005) (upholding 2,000-foot buffer zone); see also Doe v. Bredesen, 507 F.3d 998, 1004 (6th Cir. 2007) (“The [Tennessee] Act’s registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment, and the district court correctly found that they do not constitute an affirmative disability or restraint in light of the legislature’s intent.”); Standley v. Town of Woodfin, 186 N.C. App. 134, 650 S.E.2d 618 (2007) (upholding ban on entering public park); Doe v. Baker, No. Civ. A. 1:05-CV-2265, 2006 WL 905368 (N.D. Ga. 2006) (unpublished opinion) (upholding 1,000-foot buffer zone). Clearly, such exclusions cause lost opportunities for housing and employment for offenders, yet these prohibitions were upheld as nonpunitive.
I am not persuaded the federal courts would find KORA to impose requirements traditionally considered to be affirmative disabilities or restraints to the point of weighing this factor against constitutionality.
*343 Traditional Aims of Punishment
The third Mendoza-Martinez factor is whether the “regulatory scheme . . . promotes the traditional aims of punishment.” Smith, 538 U.S. at 97. The Court has described those aims as retribution and deterrence. See, e.g., Mendoza-Martinez, 372 U.S. at 168.
The majority’s analysis of this factor is muddled and difficult to unpack. It is unclear to me whether the majority is relying on the articles attached to Does summary judgment motion or its own intuition. As best as I can tell, the majority ultimately ignores the attachments and simply holds that KORA promotes traditional aims of punishment because the legislature increased the reporting term from 10 to 25 years. 304 Kan. at 325. But this conclusion is at odds with the federal caselaw.
But tire fact that KORA has a deterrent effect is not conclusive. The Smith Court found that “[a]ny number of government programs might deter crime without imposing punishment” and "‘[t] o hold that the mere presence of a deterrent purpose renders such sanctions “criminal” . . . would severely undermine the Government’s ability to engage in effective regulation.’ [Citations omitted.]” 538 U.S. at 102. The Court also rejected the lower court’s finding that Alaska’s registration obligations were retributive based upon tire length of reporting differing between individuals convicted of nonaggravated offenses and those “convicted of aggravated or multiple offenses.” 538 U.S. at 102. The Court found the “categories . . . and the corresponding length of the reporting requirement are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective.” (Emphasis added.) 538 U.S. at 102.
The Smith Court’s analysis is equally applicable to KORA, though not wholly dispositive because the Court was addressing a 15-year registration requirement and KORA has a 25-year requirement. But SORNA imposes a 25-year registration requirement on Tier II offenders and a lifetime requirement on Tier III offenders, 42 U.S.C. § 16915 (2012), and the federal courts addressing this issue have upheld SORNA based on Smith.
The Eleventh Circuit addressed this registration requirement in W.B.H. and held that SORNA is no different than the Alaska act at *344 issue in Smith. 664 F.3d at 858-59. The W.B.H. court reasoned that SORNA is “reasonably related to the danger of recidivism posed by sex offenders.” 664 F.3d at 858. And the court explained that while SORNA “allows the public and law enforcement to determine the general whereabouts of convicted sex offenders, ... it does not directly restrict their mobility, their employment, or how they spend their time.” 664 F.3d at 858. So, the court found that any deterrent effect or purpose of SORNA does not justify a finding that the acts purpose is punitive. 664 F.3d at 858; see also Under Seal, 709 F.3d at 265 (quoting from Smith to find that SORNA does not promote traditional aims of punishment).
I would find under Smith and the cases interpreting SORNA that the traditional aims of punishment factor weighs in favor of KORA being fairly characterized as nonpunitive.
Rational Connection to Nonpunitive Purpose
In Smith, the Court identified this as “a ‘most significant’ factor in our determination that the statute’s effects are not punitive.” 538 U.S. at 102 (citing United States v. Ursery, 518 U.S. 267, 290, 116 S. Ct. 2135, 135 L. Ed. 2d 549 [1996]). The Smith Court did not elaborate on what is meant by “rational connection to a nonpun-tive purpose” before analyzing the Alaska act under the standard. One commentator has noted that the standard is “deferential to the state purpose (much like rational basis review under substantive due process analysis).” Hobson, Banishing Acts: How Far May States Go to Keep Convicted Sex Offenders Away from Children?, 40 Ga. L. Rev. 961, 984 (2006). In State v. Cook, 286 Kan. 766, 774, 187 P.3d 1283 (2008), this court determined that “the registration act was intended to promote public safety and to protect the public from sex offenders, who constitute a class of criminals that is likely to reoffend.”
The majority concludes that arguably under the current version of KORA, “public safety has become a pretext.” 304 Kan. at 326. The majority finds fault with KORA because it does not distinguish between types of offender's and contains no mechanism for relieving a “fully rehabilitated” offender from its notification burdens. But the Ninth Circuit and others have rejected similar arguments. In Matso, the court held:
*345 “Plaintiffs argue Smith overstated the risk of sex-offender recidivism. They note that Smith cited several studies on sex offender recidivism. See id. at 104. Plaintiffs then rely on an expert declaration critiquing the methodology of the recidivism studies in Smith. The district court did not malee any factual finding regarding the risk of sex offender recidivism. Even had it adopted the declaration’s conclusions as its own, a recalibrated assessment of recidivism risk would not refute the legitimate public safety interest in monitoring sex-offender presence in the community.” 670 F.3d at 1057.
See also Bredesen, 507 F.3d at 1006 (Tennessee Legislature “could rationally conclude that sex offenders present an unusually high risk of recidivism, and that stringent registration, reporting, and electronic surveillance requirements can reduce that risk and thereby protect the public” and concluding that “[wjhere there is such a rational connection to a nonpunitive purpose, it is not for the courts to second-guess the state legislatures policy decision”). In addition, the Second Circuit recently held the New York Legislature’s “decision to eliminate the possibility of relief from registration for twenty years” for level one offenders did not render the registration provisions punitive. Cuomo, 755 F.3d at 112.
The majority fails to cite any authority for its analysis of this factor; and the proposition that offender registration schemes are rationally related to the nonpunitive purpose of public safety finds overwhelming approval in the federal caselaw. Even Myers, 260 Kan. at 681, appears to assume offender registration is rationally connected to public safety, and the Alaska state case that held post-Smith changes to the Alaska act were an ex post facto violation admits registration, at least as to sex offenders, advances a nonpuni-tive public safety purpose. See Doe v. State, 189 P.3d 999, 1015-16 (Alaska 2008).
I do not see how the majority can say no public safety purpose is rationally furthered by having sex, drug, and violent offenders register. I would follow tbe referenced precedent and hold that KORA has a rational connection to a nonpunitive purpose, so this factor does not weight towards punishment.
Excessive in Relation to Regulatory Purpose
In Smith, the Court clarified that “[tjhe excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining *346 whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective.” 538 U.S. at 105. The Smith Court further noted that ex post facto jurisprudence does not preclude a state from making reasonable categorical judgments that certain crimes should have particular regulatory consequence.
Instead of independently analyzing this factor, the majority merely harkens back to the ground it already plowed, concluding: “Our discussion of the other factors has touched upon the excessive nature of KORA.” 304 Kan. at 327. The majority then specifically cites the fact that the 2011 KORA amendments required more information from the offenders and that the penalty for noncompliance has increased. 304 Kan. at 327. I would hold that neither of these requirements is excessive given KORAs public safety purpose based on the authority cited above.
Conclusion
Although the 2011 KORA offender registration scheme imposes a number of burdens on sex offenders, I believe the applicable federal caselaw considering similar burdens under other offender registration schemes compels us to conclude that tire 2011 KORA amendments do not violate the United States Constitutions Ex Post Facto Clause as applied to sex offenders and that the United States Supreme Court would so hold.
Nuss, C.J., and Luckert, J., join in the foregoing concurring and dissenting opinion.